REDMAN OIL CO. *v.* SHAW.

1. SPECIFIC PERFORMANCE—FRAUD.

In suit for specific performance of a written agreement to transfer oil and gas leases, bill would be dismissed if agreement were procured from defendant by plaintiff through perpetration of a fraud in fact or law.

2. SAME—FRAUD—BURDEN OF PROOF—EVIDENCE—OIL AND GAS LEASES.

In suit for specific performance of agreement to transfer certain oil and gas leases in vicinity of well about to be drilled by the parties to the agreement, defendant's burden of proof as to fraud alleged to have been practiced upon him by plaintiff, either in the particular that plaintiff's agents procured certain other leases from owners which each party knew the other had attempted to procure, in making statements as to interest of a third party in defendant's leases, or as to representations made to defendant respecting another well then being drilled in the vicinity which turned out to be a successful venture, *held*, not sustained under record presented.

3. APPEAL AND ERROR—SPECIFIC PERFORMANCE—DRILLING OIL WELLS.

In suit for specific performance of agreement to convey certain oil leases under which plaintiff is required to drill a well, time within which he may be required to commence drilling a well is extended to 40 days from decision herein or other appropriate order incident to final decision.

Appeal from Allegan; Miles (Fred T.), J. Submitted October 17, 1939. (Docket No. 100, Calendar No. 40,779.) Decided November 9, 1939. Rehearing denied December 20, 1939.

Bill by Redman Oil Company, a Michigan corporation, against Arthur F. Shaw for specific performance of an agreement to assign gas and oil leases. Decree for plaintiff. Defendant appeals. Affirmed.

*Butterfield, Keeney & Amberg, Morton Keeney* and *Richard Lindland,* for plaintiff.

*Leo W. Hoffman,* for defendant.

NORTH, J.   Plaintiff's bill is for specific performance of an agreement to assign certain oil and gas leases.   The defense is that the written agreement to assign these leases was procured by fraud.   The circuit judge found defendant failed to establish actionable fraud and decreed specific performance.   Defendant has appealed.

In December, 1938, defendant and Mr. Clayton Redman were interested in drilling an oil well in Salem township, Allegan county.   Mr. Redman owned the controlling interest in the Redman Oil Company; and for the purposes of decision herein there is no occasion for distinguishing between the corporate identity of plaintiff and Mr. Redman as an individual, or in his activities as trustee for himself and others in the oil business.   Previous to the transaction involved in this suit, Mr. Shaw, Mr. Redman, and a third party had put down an oil well somewhat further north and had obtained a showing of oil but not in commercial quantities.   The showing from this well caused both Mr. Shaw and Mr. Redman to believe there was an oil pool in the immediate vicinity, but its exact location was uncertain.   Each had oil leases on a substantial acreage in the general locality, and it was of mutual advantage to have another well put down which would establish the character of the territory.

The Redman Oil Company, a Michigan corporation, is principally engaged in drilling oil wells.   In conjunction with this activity oil and gas leases are acquired.   Some are taken in the name of the corporation, some in Mr. Redman's name, and some in his name as trustee.   In December, 1938, Mr. Shaw and Mr. Redman were negotiating relative to putting down a well in the locality of their Allegan county leases.   They met on December 9th, 14th, and 16th. On this latter date they met at Mr. Shaw's office in

Grand Rapids and spent the whole afternoon in negotiations which finally resulted in the agreement of which specific performance is sought in this suit.

The plan which resulted in the agreement was that a well should be put down on one of the parcels on which Mr. Redman already had the lease but in the immediate vicinity of which Mr. Shaw also had leased acreage. Instead of making a cash contribution towards the cost of the well, the plan was that Mr. Shaw should assign to plaintiff his leasehold rights in certain of the parcels in the locality. At the beginning of the negotiations Mr. Shaw was of the mind that he should not assign for this purpose more than his leasehold rights in four 40-acre parcels; but Mr. Redman thought he should have the leasehold interest in eight forties. During the negotiations Mr. Shaw urged that the transaction should be closed on such a basis that each would have substantially equal acreage left in the locality. Mr. Redman insists that their relative acreage was of little or no consequence in reaching their agreement; but instead the question was in how many forties should Mr. Shaw assign his leasehold interests to constitute his fair contribution to the cost of putting down the well. Late in the afternoon of December 16th the parties finally agreed that Mr. Shaw would assign to plaintiff his oil and gas leasehold interests in six designated forties in consideration of plaintiff putting down a well on an agreed 40-acre parcel in which plaintiff or Mr. Redman had the oil and gas rights; and it was further agreed that Mr. Shaw should have a one-fourth interest in this well and the 40-acre lease.

The agreement was reached about 6:30 p. m. It was typewritten by Mr. Shaw and executed by the respective parties. For reasons hereinafter noted, Mr. Shaw on the morning of December 17th telegraphed Mr. Redman at Alma, Michigan as follows:

"Our deal is off. Reason just returned from Voyt farm. Perkins and Hill got his lease also they made a deal with Otto Homrich. You know deal with you was with understanding that I was to have both Voyt and Homrich leases."

One of the frauds Mr. Shaw alleges was perpetrated upon him by Mr. Redman is that throughout the negotiations on the afternoon of December 16th Mr. Redman understood that Mr. Shaw was expecting to obtain an oil and gas lease from the property owners on the Voyt 60 acres and the Homrich 20 acres in the locality of the contemplated oil well. Mr. Shaw's position is that they closed their deal with the understanding that he was to obtain these leases; but notwithstanding this a Mr. Perkins and a Mr. Hill, who were securing oil leases in the locality for plaintiff, were at this very time negotiating for the oil rights in the Voyt and Homrich parcels. As a matter of fact they reached agreements with the landowners during the evening of December 16th, in consequence of which the oil leases were obtained in the name of Clayton Redman, trustee. A little later in the evening Mr. Shaw learned of this. It was due to this fact that Mr. Shaw sent to Mr. Redman the telegram above quoted.

As a defense to plaintiff's suit for specific performance of the December 16th agreement, Mr. Shaw asserts that the agreement was obtained because of fraud perpetrated upon him in the particular above noted. He claims that he was deceived by Mr. Redman concerning the so-called Voyt lease and the Homrich lease. If in fact or in law Mr. Redman perpetrated a fraud on Mr. Shaw, plaintiff's bill of complaint should be dismissed. But decision must be based upon proof. Admittedly throughout the negotiations during the afternoon of December 16th, Mr. Redman and Mr. Shaw proceeded on the theory

or assumption that the latter might and probably
would acquire the Voyt and Homrich leases.   Mr.
Shaw told Mr. Redman that the Homrich lease had
been promised to Mr. Shaw.   Mr. Shaw testified:
"Mr. Otto Homrich told me several times, whenever
I was ready to do business, he was; there was a very
pleasant understanding."   During their negotia-
tions Mr. Redman seems to have taken the position
that it was altogether probable Mr. Shaw would ob-
tain the Voyt and the Homrich leases.   But each of
these men knew that Mr. Shaw did not then have
these leases and that he might never get them.   Each
knew attempts had been made to secure these leases
for Mr. Redman, as well as other leases in the vicin-
ity.   There is very credible testimony that because
of dissatisfaction with the outcome of a former oil
and gas lease between Mr. Shaw and Mr. Otto Hom-
rich that the latter was decidedly disinclined to give
another lease to Mr. Shaw, and that Mr. Shaw was
aware of this fact.   But the important aspect of the
record is that there is no testimony that, at the time
these men were negotiating on December 16th, Mr.
Shaw had any definite assurance that he would be
given either the Voyt lease or the Homrich lease.
The record conclusively discloses that these leases
were not secured by Hill and Perkins (for Redman)
until some time in the evening of December 16th, and
after Mr. Shaw and Mr. Redman had closed their
deal on that day.   In fact the Homrich lease was not
executed by Otto Homrich and his wife until Decem-
ber 17th, although others interested as lessors in this
contract had signed it the previous evening.   While
the Voyt lease was signed during the evening of De-
cember 16th, it was not delivered to Redman's rep-
resentative until December 17th.   On December 16th
both Mr. Shaw and Mr. Redman knew that the Voyt
and Homrich acreage was not under lease.   It was

open territory. Each knew the other had endeavored to obtain these leases. Redman was told by Shaw that he had the promise of the Homrich lease; but Mr. Otto Homrich testified:

"I never at any time promised Mr. Shaw that I would lease to him in the event he started drilling another well in that vicinity."

Defendant's witness Ronald Hill testified:

"Mr. Homrich made the statement that he wouldn't lease to Mr. Shaw."

It may be unfortunate for Mr. Shaw that he entered into his agreement with Mr. Redman on the assumption that he (Shaw) would be able to secure oil leases on the Voyt and Homrich lands; but in doing so he relied on his own judgment, and there is no proof that he was deceived or misled by any false or fraudulent representation on the part of Mr. Redman. It is true Mr. Redman did not tell Mr. Shaw that at that very time Redman's representatives were trying to get these leases; but Mr. Redman's testimony stands undisputed to the effect that while he knew Hill and Perkins were endeavoring to get other leases in this general locality he did not know that they were then negotiating with Voyt and Homrich; and further the undisputed testimony is that these leases were obtained after Mr. Shaw and Mr. Redman had executed their agreement, although it was on the same date. Both Mr. Shaw and Mr. Redman were well experienced in the matter of obtaining and trafficking in oil and gas leases. In their negotiations with each other they were dealing at arm's length. Mr. Shaw prepared the written agreement which the parties executed on December 16th. He was a lawyer of years of experience. If he had intended this agreement with Mr. Redman was to be

contingent upon his obtaining the Voyt and Homrich leases it would have been a simple matter to have so provided in the signed instrument. Notwithstanding Perkins and Hill obtained the Voyt and Homrich leases for Redman, still Mr. Shaw was left in no more disadvantageous position than he would have been if some third party had secured these leases, or if these landowners, learning that a well was about to be put down in the vicinity, had refused to enter into any lease at all.

Under this record we are unable to find that Mr. Redman was guilty of any misrepresentations or fraudulent conduct incident to the Voyt and Homrich leases in consequence of which Mr. Shaw is entitled to be released from the agreement entered into between these parties on December 16, 1938.

There are two other grounds of alleged fraud in consequence of which defendant asserts he should not be required specifically to perform the agreement of December 16th. And defendant did not have full knowledge of either of these alleged false and fraudulent misrepresentations when he sent Mr. Redman the above-quoted telegram of December 17th. This would account for the fact that the telegram did not refer to either of these other alleged frauds. But within a few days thereafter Mr. Shaw did learn of the facts which he now relies upon and alleges constituted a fraud perpetrated upon him by Mr. Redman. We briefly note the facts as to each of these claimed frauds.

On December 8, 1938, defendant wrote to Mr. James C. Graves, president of the Basin Oil Company, at Saginaw, Michigan. In his letter Mr. Shaw made reference to the oil well that he and Redman and another had drilled in the territory north of that involved in this suit; and he concluded his letter as follows:

"I would like to have your suggestions as to what should be done with regard to further development of that territory."

No reply had been received by Shaw when he and Redman were negotiating on December 16th; and Mr. Shaw testified:

"During the afternoon I made this statement to him (Redman), that I wouldn't enter into any contract with him until I heard in reply to this letter I had written Mr. Graves, and he said to me: 'I was in Saginaw yesterday and talked with Mr. Graves, and Mr. Graves told me that he is not interested in your proposition or your location.' I believed that, and that eliminated one of the reasons why I didn't want to make the contract that day."

. Mr. Redman squarely contradicted Mr. Shaw's claim in this particular by testifying:

"I didn't say to Mr. Shaw, in the course of that conversation, that I had discussed this or any other deal in Salem township, section 1, with Mr. Graves. I didn't say to Mr. Shaw that I had discussed this whole matter with Mr. Graves and that he wasn't interested in Mr. Shaw's acreage. * * * I didn't state to Mr. Shaw that 'I was in Saginaw yesterday and talked with Mr. Graves, and he told me that he was not interested in your leases.' * * * On the 16th he said he hadn't heard from him yet, and that he wasn't sure yet he was—when he was going to hear from him, and that by the time he did hear from him it might be too late to accept my deal on this."

The other alleged fraud had reference to what Mr. Redman knew and what he told Mr. Shaw on December 16th as to the prospects of the Sutter well (also called the Wilson well), then in process of drilling, being a successful venture. The Sutter or Wilson well was located to the southwest of the acre-

age covered by leases held by Shaw and Redman. Oil was struck in the Sutter well four days after Shaw and Redman signed the December 16th agreement; and "12 or 15 good wells in that locality" were developed shortly thereafter. Concerning his inquiry on December 16th from Redman about the Sutter or Wilson well, Mr. Shaw testified:

" 'If the Wilson well is good,' I said, 'You know I could with one forty drill this well, why should I give you six forties for a well that can be drilled for one if it (the Wilson well) is good?' He said, 'But it is not good.' I said, 'What indirect information do you have?' He said, 'My information is that it is running 20 feet lower than the well to the south.' I said, 'Well, if it is 20 feet lower than the dry hole to the south, it is a dry hole without any question.' He said, 'We can just discard that from our conversation, * * * it is a dry hole, we must go ahead on a wild-cat basis.' * * *

"His strong argument was that the (Wilson) well was going to be dry, from information he had it was going to be dry, (because it was) 20 feet lower than one that was already dry. * * * I didn't dream it was going to be good; I believed him."

The pertinency of defendant's claim that Redman told him the Sutter well was 20 feet lower than the well to the south which had proven to be a dry hole is that this meant a prospectively productive strata had not yet been reached at this stated lower point in the Sutter well. The fact was that the red rock or Traverse formation had been reached in the Sutter well at a point 20 feet above, instead of 20 feet below, the dry hole which had been drilled to the south.

Touching this controversy as to his having made a misrepresentation concerning the drilling at the Wilson well, Mr. Redman testified:

"During the course of that conversation, Mr. Shaw didn't ask me what information I had as to

the log of that (Sutter or Wilson) well, or any similar question. * * * Mr. Shaw didn't ask me for information that I had on that well.

"*Q.* Did you at any time during that conversation say to him, I have indirect means of obtaining information?

"*A.* No, sir.

"*Q.* And that well is running 20 feet lower than the first Wilson well on section 11?

"*A.* No, sir.

"*Q.* And did you at any time volunteer any such statement?

"*A.* No, sir."

While there is testimony of facts and circumstances which may be considered as sidelights on the controverted issue as to either of these alleged frauds, there is no testimony having any particular convincing force which materially corroborates the claim of Mr. Shaw or the directly contradictory claim of Mr. Redman. The burden of proof of the alleged frauds was on Mr. Shaw. The record is substantially his word against that of Mr. Redman. But in this connection it may be noted that the record contains some rather seriously impeaching testimony as against Mr. Shaw. Under the testimony produced it must be held that Mr. Shaw has not sustained the burden of establishing the frauds charged against Mr. Redman and in consequence of which defendant contends we should reverse the decree of the trial court which granted specific performance of the contract of December 16, 1938. Our review of this record brings us to the conclusion that the decree of the circuit court should be affirmed; provided, however, that the time limit within which plaintiff was to have commenced drilling as specified in the decree of the circuit court is extended to 40 days from and after the decision of this court; and in event defendant shall apply for a rehearing in this court the

period within which plaintiff shall commence drilling, if at all, will be fixed by an appropriate order incident to final decision.

Except in the particular above noted, the decree entered in the circuit court is affirmed, with costs to appellee.

BUTZEL, C. J., and WIEST, BUSHNELL, SHARPE, POTTER, CHANDLER, and McALLISTER, JJ., concurred.